FILED

2021 Mar-29  AM 10:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RANDY ALBRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:18-cv-01005-JHE |
| | ) | |
| LOWE'S HOME CENTERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

Plaintiff Randy Albright ("Albright" or "Plaintiff") brings this employment discrimination action against Defendant Lowe's Home Centers, LLC ("Lowe's"), contending Lowe's failed to promote him because of his age in violation of the Age Discrimination in Employment Act ("ADEA"). (Doc. 1). Lowe's has moved for summary judgment on Albright's sole claim. (Doc. 25). Albright opposes that motion, (doc. 29), and Lowe's has filed a reply in support, (doc. 30). The motion is fully briefed and ripe for review. (Docs. 26, 29 & 30). For the reasons stated more fully below, Lowe's motion is **GRANTED**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 9).

to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the nonmovant's favor when sufficient competent evidence supports the nonmovant's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will

not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

Albright has worked for Lowe's since 1998. (Deposition of Randy Albright, doc. 28-1 ("Albright Depo.") at 9 (27:9-11)). He has worked as a Lead Receiver/Stocker at Lowe's Inverness location in Birmingham, Alabama since 2005. (*Id.* at 17 (59:11-61:3)). At the time of the events giving rise to this lawsuit, Albright was 60 years old. (Declaration of Randy Albright, doc. 29-1 ("Albright Decl.") at ¶ 4).

Albright is a good employee, well-liked by his coworkers and described by his former assistant store manager ("ASM") Timothy "Tim" Shelley ("Shelley"), as "highly reliable, hard worker, great work ethic." (Deposition of Wayne Jones, doc. 28-3 ("Jones Depo.") at 22 (74:10-20); Deposition of Brad Sloan, doc. 28-4 ("Sloan Depo.") at (86:10-21); Deposition of Timothy Shelley, doc. 28-7 ("Shelley Depo.") at 14 (44:15-45:22)).

### A. Night Stocking Manager Position

Due to increased store volume, Lowe's created a new Night Stocking Manager position at the Inverness store in late 2017. (Jones Depo. at 15-16 (49:23-51:12)). The Night Stocking Manager's responsibilities included supervising the night stocking team to ensure that incoming merchandise was placed in the correct location (on a shelf, in top stock, or in storage). (Shelley Depo. at 36 (131:14-132:11)). Like all job openings at the Inverness store, this position was posted internally for several days, then posted externally. (Jones Depo. at 14-15 (45:19-47:19)). Several dozen candidates applied for the job, including Albright and Nethanlius "Nate" Mitchell ("Mitchell"), a 43-year-old fellow Receiver/Stocker at the Inverness store. (Jones Depo. at 18

(58:21-59:5), 22 (74:10-77:18); Deposition of Nethanlius Mitchell, doc. 28-9 ("Mitchell Depo.")
at 5 (7:11-12)).

Human Resources Manager Wayne Jones ("Jones"), who was in his mid-50s, reviewed the
applications and determined which candidates would be interviewed for the position. (Jones Depo.
at 15 (48:10-14); Sloan Depo. at (92:22-93:13)). Ultimately, Jones selected Albright and Mitchell
for interviews. (Jones Depo. at 22 (74:10-76:9)). Lowe's guidelines previously recommended
interviewing at least three people for a position. (*Id.* at 34 (122:3-123:7)). However, in November
2017—prior to the interviews in this case—Lowe's eliminated this recommendation, although it
had not updated its form to reflect the change by the date of the interviews. (Deposition of Kathy
Seifried, doc. 28-6 ("Seifried Depo.") at 18-19 (61:15-62:4); Shelley Depo. at 13 (39:14-20)).
Jones testified that he "might have . . . made phone calls" to other candidates, but could not recall
selecting any of them and did not recall why that was the case. (Jones Depo. at 19 (63:21-65:2),
34 (122:3-123:7)). In any event, no other candidates were interviewed. (*Id.* at 19 (63:21-65:2)).

Albright had more years of relevant employment with Lowe's than Mitchell at the time of
the interview process, as well as more years of relevant retail experience, experience related to
receiving and stocking, and experience preventing shrink. (*Id.* at 33 (118:1-120:12)). Albright
had also been performing many of the job duties of the Night Stocker Manager position as Lead
Receiver/Stocker. (Sloan Depo. at 19-21 (65:2-67:17, 69:8-15, 70:7-71:23), 25 (86:10-87:9); doc.
28-5 at 11-12). By contrast, Mitchell had only worked at the Inverness store as a Receiver/Stocker
in October 2017 (although he had previously worked at the Hoover, Alabama Lowe's from 2013
or 2014 to 2016). (Mitchell Depo. at 9 (24:20-25-1), 16 (53:1-8)). Mitchell's application also
contained multiple inaccuracies regarding his experience and qualifications for the Night Stocking

Manager position (Jones Depo. at 29-30 (102:15-106:22); Mitchell Depo. at 26 (90:4-93:14); doc. 28-5 at 17-21; doc. 28-9 at 56-61).

### B. Interviews

Jones chose ASM Brad Sloan ("Sloan") and ASM Shelley to conduct interviews with the two candidates.[2]  (Jones Depo. at 20-21 (69:6-72:10)).  Jones provided a packet to both ASMs containing interview worksheets and the candidates' applications.  (*Id.*).  Sloan and Shelley each testified they played no role in selecting candidates for interviews.  (Sloan Depo. at 28 (100:21-101:1); Shelley Depo. at 23 (78:12-79:21)).  However, Shelley testified he understood Jones had coordinated with Sloan to select who would be interviewed.  (Shelley Depo. at 13 (38:15-19)).

Lowe's provides an interview packet containing predetermined questions and a matrix for interviewers to evaluate candidates' answers.  (Doc. 28-5 at 25-46; Albright Depo. at 11 (35:3-8), 23 (83:4-84:8); Mitchell Depo. at 29-30 (103:20-106:7)).  Prior to the interview, the interviewer is instructed to read a series of statements to the applicant, including the following: "Before we begin with the formal interview questions, tell me a little bit about your previous work experience and what interests you about this job."  (Doc. 28-5 at 26).  The instructions indicate the interviewer is to "ask the lead question for each competency and ask probing questions when you need more information."  (*Id.*).  The scoring matrix ranges from 1, which is "Ineffective," to 7, denoting

---

[2] Sloan's account of the decision to have him conduct the interview differs somewhat.  In Sloan's recounting, Store Manager Ken Dixon was out on medical leave at the time, and Interim Store Manager Rodney Geeslin asked Sloan to conduct the interviews in what Sloan assumed was the mistaken belief that the Night Stocking Manager position would fall under Sloan's purview.  (Sloan Depo. at 28-29 (98:11-100:20, 103:17-104:8), 31 (110:22-111:14)).  Sloan testified he believed Geeslin was confused by an ongoing corporate restructure.  (Sloan Depo. at 28 (99:3-100:3), 31 (110:22-112:16)).

"Master or Role Model." (*Id.* at 27). Underneath the matrix is some guidance— "behavioral anchors"—indicating what sorts of responses fall into each category. (*Id.*; doc. 28-3 at 69). For example, a candidate's answer might reflect a rating more towards the "Ineffective" or "Limited Competence" (i.e., 1 or 2) end of the range in the category of Getting Organized by providing an example that "was trivial in nature and did not include challenging demands," while a candidate might achieve an "Advanced Competence" or "Master or Role Model" rating (i.e., 6 or 7) for providing "an example of a significant and challenging situation that included several substantial demands." (Doc. 28-5 at 27). The instructions provided to interviewers indicate a "rating of 3 (Approaching Solid Competence) would indicate behaviors mostly in the middle box, but maybe one or two behaviors in the low end box. A rating of 6 (Advanced Competence) would indicate behaviors mostly in the high end box but maybe one or two behaviors in the middle box." (Doc. 28-3 at 69). At the end, the packet states: "The applicant with the highest Average Interview Score should be selected. If an applicant with a lower score is selected, the reason for this decision must be documented below, only on the selected applicant's interview guide." (Doc. 28-5 at 35, 46). The instructions also list numerous topics to avoid during interviews, including "age/date of birth." (Doc. 28-3 at 69).

### 1. Brad Sloan Interviews

Sloan conducted the first interview of both candidates on January 19, 2018. (Doc. 28-5 at 25-46). Sloan had attended an offsite development meeting for ASMs in 2011 including some training on the interview process, but most of his training came from hands-on experience with other managers. (Sloan Depo. at 17-18 (57:17-60:12)). Sloan's grading was based on a subjective judgment of which candidate's answer he felt had better fit the question. (*Id.* at 17 (55:1-4)).

Prior to his interview with Albright, Sloan stated "you and I don't usually get interviews." (Albright Depo. at 25 (92:9-93:9)).  Based on Sloan's tone of voice and his similar age, Albright interpreted this statement as a derogatory remark and responded, "Are you referring to my age?" (*Id.* at 26 (96:17-97:7); Declaration of Randy Albright, doc. 29-1 ("Albright Decl.") at ¶ 9).  Sloan did not deny the allegation, but instead "just kind of laughed it off."  (Albright Depo. at 26 (97:8-10)).   Jones testified Sloan had admitted to the comment but characterized this as a joke, while Sloan denied making the comment at all.   (Jones Depo. at 41 (151:10-152:19); Sloan Depo. at 41:15-20)). [3]

During the interview, Sloan told Albright that Albright was qualified for the position and stated he knew Albright could do the job.  (Albright Depo. at 27 (99:12-23), 33 (122:4-11)).  Sloan was familiar with Albright's performance.  (Sloan Depo. at 18-19 (61:13-18, 64:4-8), 29 (102:9-11)).  Conversely, Sloan had not observed Mitchell working prior to the interview.  (*Id.* at 29

---

[3] Although Albright testified at his deposition this was the only time management commented on his age during his employment, (Albright Depo. at 26-27 (97:16-8)), Albright points to another age-related incident in his declaration in opposition to summary judgment: a storewide meeting (prior to his application for the Night Stocking Manager position) at which Sloan "pointed [Albright] out as the oldest employee at the store."  (Albright Decl. at ¶ 5).  Sloan testified he had recognized Albright as meeting the milestone of being the "most senior tenured" employee at the location, but denied saying Albright was the oldest employee.  (Sloan Depo. at 14-15 (44:16-49:7)).  For summary judgment purposes, to the extent it is relevant, the undersigned resolves this conflict in Albright's favor.

In a short footnote, Lowe's contends Albright's statement in his declaration "is a sham and should be disregarded, (doc. 30 at 2, n.1), but beyond a citation to *Tippens v. Celotex, Corp.*, 805 F.2d 949, 9554 (11th Cir. 1986), it does not support this with any argument.  Although the sham affidavit doctrine—which prohibits a party from contradicting clear deposition testimony through a later affidavit, *see Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1161 (11th Cir. 2012)—might apply, a single sentence in a footnote is not an adequate means of raising an evidentiary objection.  In any case, considering this incident does not affect the undersigned's ultimate conclusion.

(102:3-11)).  Sloan did not explicitly ask Mitchell about his prior work experience, despite this question appearing on the interview instructions.  (Sloan Depo. at 40 (148:8-149:10)).

Sloan's notes reflect the following answers from the candidates:

| | ALBRIGHT | MITCHELL |
|---|---|---|
| **1. Tell me about a time when you had several priorities competing for your time and attention.** | Most priority - label or number them – make adjustments on what is needed depending on task. | Buffalo Rock – <br><br>Supervisor – lots of responsibility @ one time<br><br>Trains, learns scheduling, classes or responsibilities<br><br>Got his assist to train and help repair how to be help with new employees<br><br>Delegate tasks<br><br>Check back to ensure tasks were completed<br><br>Multitasking – took a deep breath!!! |
| **2. Think about a complex project you led. Talk about your process for assigning tasks, monitoring progress, and giving feedback.** | Tackle the situation<br><br>Talk with co workers on their opinion in getting task done<br>Monitor the process – how are we going to accomplish the task | Att & Buffalo Rock – <br><br>Buffalo Rock sponsors Regions Golf – <br><br>Setting up booths, who had experience found out what their strengths were to help set up and maintain the event – got them in 3 man teams, got one person in charge of the team – walkie talkies to help communicate<br><br>Shift members to help struggling members<br><br>Task completed |
| **3. Tell me about a time when you took a complex situation or issue and provided a simple and actionable solution.** | Several situations, most time provide the best possible solution – most were not complex but just different – <br><br>See best way to solve or answer the situation | Store #620 – Unload trucks<br><br>Just 2 people there to unload the truck<br><br>Had to recruit help throughout the store<br><br>Worked as a team – got truck unloaded |

| | | then he went back to sale floor to help get returns & zoning done - teamwork |
|---|---|---|
| **4. Describe a time when you motivated an individual or team to achieve a very challenging goal.** | Encourage – Lot of freight<br><br>Lots – Encourage the team by talking through the issues | Buffalo needed volunteers for some overnight help get them set up @ Fort Walton (treated dinner out of his own pocket) |
| **5. Think about a time when you were responsible for explaining a new process or way of doing something to your team or peers.** | Based on information, explain to them how to best do it – if unclear then would ask and follow up w/new members | Att – Cust. Sales – Bundle Packages<br>How to Lead the customer<br>Assigned 5 people – Set up a mock training class<br>How to go into Bundle package sale<br>Teach/Relax<br>Group got high market sales |
| **6. Describe a time when a customer was not satisfied with a situation that you handled.** | Re ask – "what can I do?"<br>Slow it down, find out what their true issue is | Lanes – Cynthil 620<br><br>Went to plumbing. Black iron tubs<br><br>Two types – order the tub – dissatisfied with the tub<br><br>Was not what she was showed by Nate<br><br>Had to work with customer to rectify<br>She calmed down<br><br>Ordered the right tub<br><br>What she thought was not what came in |
| **7. Tell me about a time you worked hard to overcome differences with someone and develop a positive working relationship with that person.** | Sometimes people don't work the same.<br><br>Worked together – focus on what the situation is<br><br>Keep outside problems outside | Buffalo Rock-<br>Supervisor position was given to Nate after person didn't get the position<br>Didn't want to help –<br>Dismissed the situation w/the teammate<br>Asked and found out no problem<br>Actions seem different |
| **8. Describe a time when you set a goal that had an important impact on the store's or company's bottom line.** | Seasonal –<br>Personal when can't finish with getting freight off cabinet aisle-<br>Get everything up so customer has product available | Tool Program @ Buffalo Rock<br>Got together - Looked @ how they could set up a new program for new employees – all the old tools could be exchanged for credit<br>Harbor Freight – get a discount and helped with new employees would have |

| | | the tools needed. |
|---|---|---|

(Doc. 28-5 at 25-46; Declaration of Brad Sloan, doc. 28-11 ("Sloan Decl.") at ¶ 4).  Adding up the scores on the matrix, Sloan gave Albright an interview score of 32 (an average interview score of 4.0) and Mitchell a score of 46 (an average interview score of 5.8).  (Doc. 28-5 at 35, 46).

Sloan testified that after conducting the interviews, he realized that he was interviewing for "an area that wasn't in my area of operations in the store . . . ."  (Sloan Depo. at 29-30 (103:17-106:9).  Sloan felt that ASM Shelley, under whom the Night Stocking Manager would work after the restructure, should make the hiring decision.  (*Id.* at 29-31 (103:17-106:9, 110:22-111:14)).  After completing the interview, Sloan met with Shelley and told Shelley whom he had interviewed and that he did not feel like he should make the hiring decision; Shelley does not recall Sloan telling him anything else, including anything about either candidate or interview.  (Shelley Depo. at 24 (82:11-83:12)).

### 2. Tim Shelley Interview

Like Sloan, Shelley had received training on interviewing through "hands-on" training with his coworkers, including other ASMs.  (Shelley Depo. at 8 (21:2-10)).  However, Shelley could not identify any specific formal training regarding interviewing candidates.  (*Id.* at 8-9 (20:20-21:1, 22:11-22)).  Shelley received an interview worksheet and read it, but did not recall receiving any more specific guidelines on interviewing, scoring the interview, or selecting the person to hire. (*Id.* at 9 (22:23-24:17)).

Prior to conducting interviews with the candidates, Shelley entered Jones's office and retrieved Sloan's completed interview packet.  (Shelley Depo. at 31 (110:21-111:6)).  This was not Shelley's usual practice; instead, he did so because of what he testified were, in his experience,

the unusual circumstances of having two interviewers conduct separate interviews.  (*Id.* at 30 (107:11-108:14)).  Shelley assumed he should be writing his notes on the same packet as the previous interviewer.  (*Id.* (108:15-109:1)).  Shelley obtained Sloan's completed packet for Mitchell, but did not recall picking up the packet for Albright.  (*Id.* (109:21-23).  This was inconsistent with Lowe's guidelines and contrary to Lowe's training.  (Jones Depo. at 35-36 (129:19-131:5); Seifried Depo. at 42:3-43:11, 44:10-23).  In his deposition, Jones agreed that this either showed a violation of training and policy or a lack of proper training.  (Jones Depo. at 37 (134:1-135:6)).  Shelley was not ultimately disciplined or reprimanded for this.  (Jones Depo. at 36-37 (131:14-133:2, 134:1-14)).

Shelley used Sloan's interview worksheet when he interviewed Mitchell on January 22, 2018, writing his notes and scores next to Sloan's.  (Doc. 28-5 at 25-35; Shelley Depo. at 30 (107:8-108:20)).  Shelley did not review Sloan's notes about Mitchell.  (Shelley Depo. at 31 (111:22-112:8)).  He did not do the same for Albright, whom he interviewed second; after Shelley conducted Mitchell's interview, Jones informed him that he "cannot be making notes on another manager's interview packet, and [Shelley] did not repeat that same mistake a second time."  (*Id.* (110:4-20)).  So Shelley used a clean interview packet for Albright's interview, which occurred on January 23, 2018.  (*Id.* (110:15-111:6); doc. 28-8 at 16-26).[4]

Although Shelley testified he believed it is important to know about a candidate's work experience, he did not recall asking Mitchell about the work experience listed on his resume and

---

[4] Shelley erroneously listed the interview dates as "1/22/19" and "1/23/19."  (*See* doc. 28-8 at 2, 16).

stated he did not ask Mitchell about the listed leadership experience.  (Sloan Depo. at 26 (92:7-93:15); Mitchell Depo. at 28 (100:13-101:13)).  Instead, Shelley testified that while he generally does not discuss what is on a candidate's resume, he invites interviewees to provide examples in response to interview questions that might highlight prior work experiences.  (Shelley Depo. at 25 (87:5-15)).  Shelley testified he trusted the assessment of HR to review candidates' resumes and assess whether the resume presents concerns.  (*Id.* (87:22-89:4)).

Shelley's notes from the two interviews read as follows:

|  | ALBRIGHT | MITCHELL |
|---|---|---|
| **1. Tell me about a time when you had several priorities competing for your time and attention.** | Church event the team member have different tasks. He might assist someone in financial room. He would seek a subject matter expert to fill in one job then return and pick up his first load. If having multiple tasks, prioritize based on urgency. Prioritize customers based on their need. Got to make sure things are right. Make up a check list, prioritize based on demand. Trickle down. Likes to always finish so if running late then put the extra time to get the job done (time management). | Working at Buffalo Rock was just promoted to supervisor. Had a training program to create and training curriculum and team to schedule. Had to evaluate each person at the end of training. Had to sit down and write out a plan. Made someone a lead man and set up code of conduct. His next task was to schedule people's breaks and lunches and properly plan it. Used Microsoft Word to track tasks. Multitasking means prioritizing. Once you assess it and plan out deadlines for those tasks. Then if needed delegate responsibility and entrust them to get it done and then check back to answer questions and give feedback. Pay attention to time demands and see if they need support. |
| **2. Think about a complex project you led. Talk about your process for assigning tasks, monitoring progress, and giving feedback.** | Ask employees what their expertise is. Base tasks on the subordinates level of experience and comfort level. Try to accommodate based on these criteria. Even if they aren't comfortable, figure out a way to get the job done.<br><br>Come to them and talk about expectations, quality of work, expected deadline. No excuses, and encourage a sense of urgency. Explain a sense of pride in the work. Walk the different depts and see what they are | Working at Buffalo Rock they held the Classic. He was assigned project manager of setting up the booth and displays. Plan where to park vehicles. Find out the team's strengths and weaknesses by talking to them based on tasks needed to be done thinking of tasks and customer service. Make teams of 4 for building, parking trailers, etc. Use walkie talkie to communicate. He would check in with the team periodically. If needed to coach employee, identify the good, but suggest |

12

| | | |
|---|---|---|
| | doing, see if they have a problem. Monitor their work speed.<br><br>If employee is underperforming, be aware that the employee might be discouraged by the workload. People slack off. Talk to them by sympathizing and encourage them to be steady and consistent and assure them they can get it done. Be aware they may have problems at home and encourage them to put their personal problems aside and focus on the task. | ways to improve success rate. Give suggestions based on experience, but be open to suggestions for the other person. Also show them how he does it. Be aware you may have to adapt your communication approach, like by showing, and also lead by example. If they get frustrated, explain safety and try to calm them down. A pep talk might help them see they were rushing. |
| **3. Tell me about a time when you took a complex situation or issue and provided a simple and actionable solution.** | He has experience in having a group come into the store. Ask them open ended questions and ask what he can do to help. Be willing to go above and beyond and sell the whole project. Repeat for every customer despite what department it is.<br><br>There is always a better way to do things: don't get stuck up on the traditional idea. Be open to new ideas. Best also be willing to try your own way despite popular opinion. Sometimes it will take longer but he will be consistent.<br><br>If trying something new relate the idea to the team based on his experience of the process. Suggest they be open minded. | Had a tool program at Buffalo Rock. The company wasn't getting RTM for tools so employees were taking the tools home, causing shrink. Adopted a tool program from another company. He came up w/a tool exchange program w/Harbor Freight Tools to get money back. Created a tracking log. Employees had to have a tool inventory accounting before they got their last paycheck. This program is still in effect to this day. It was a simple problem that was causing such a big issue in many aspects of the business. Once a month the company would hold meetings so that any employee could pitch an idea to upper management. If it would save the company money they would accept it and move on it. The program helped people get started easier as well as shrink issue. Got expert from Harbor Freight to help try tweak the program to work well for their section. |
| **4. Describe a time when you motivated an individual or team to achieve a very challenging goal.** | Had an experience in this store where there was a lot of freight. You have to lead by example and they encourage your team leader to work harder. Support them so they feel they are on a team.<br><br>Tell them we got a job to do. Encourage them by telling they accepted the job and must have taken it b/c they liked something about it. | Working at Lowes unloading the trucks during holiday season. Christmas in July: 3 unloaders called in so it was just 2 of them. It was slow going. Tried to motivate the less tenured employee. But he was still dragging. He went to store manager to recruit help and store manager told him to recruit help. Went around store and offered to help them in their depts. If the sales floor helped unload truck. Recruited lumber, |

| | | |
|---|---|---|
| | The sooner we get the work done the sooner we can go home.<br><br>These are the instructions he caters to regarding WIIFM. We are there to do a job and have a sense of pride in our work. Getting it done on time prevents the snowball effect of having more work tomorrow. | flooring, electrical and paint person to help. Then fulfilled their promise in each department. Explained that w/o help they will all have to stay later anyway. He and Sam helped zone and swept. At the end was smiling and motivated b/c Nate got him help. They got it all done in a reasonable amount of time. Getting help gave Sam more energy. |
| **5. Think about a time when you were responsible for explaining a new process or way of doing something to your team or peers.** | Always explain to the best of your ability. Try to have a printout/memo to review. Try to field questions or offer to follow up on questions now or questions they have in the future. To confirm understanding, ask if they have questions and again offer to be available if they think of questions later. | At Buffalo Rock they had to clock in/out w/passwords but switched to new process w/badge. They had to enter through a new door and new rules on workplace etiquette. Held meeting to explain more policies, and trusted in his good rapport w/the team. But new etiquette policy would be an issue for many of the team. In the meeting he explained the new etiquette policy and procedure. Explained workplace etiquette in a relatable way and acknowledged their camaraderie but explained that profanity had to end and emphasized it was a workplace. Consider the guests, and explained examples of getting along on other contexts. Explained it was nothing against anyone but disciplinary action could occur and then that he has to sign the new policy too. He is held to the same standard as everyone else. |
| **6. Describe a time when a customer was not satisfied with a situation that you handled.** | Had a lady who was upset. Ask if there is anything he can do to solve the problem. Try to help to the best of his ability even if it means seeking help from a mgr. Recently a customer was unhappy about a PL toilet not getting pulled so he was running late. Randy offered to help. Sought machine to get product out of topstock and offered to assist with any other projects the person has. | Working at Lowes they would do download or zone when there was no truck to unload. A customer wanted help w/a tub. She described it and it was SOS. Explained ETA was 7-8 business days. When tub came in she said it was wrong. He showed store manager what he ordered. Store manager offered to reorder. When she came in she was irate and called Nate a liar. He apologized. She wanted to cancel sale but he offered to reorder and go line by line to see where he went wrong. Confirmed his mistake. Got approval from store manager for 15% discount for |

| | | |
|---|---|---|
| | | inconvenience after consulting him. She went through w/sale. She ended up apologizing to Nate then thanked him for his patience. She did the survey and even complimented Nate for his patience. |
| **7. Tell me about a time you worked hard to overcome differences with someone and develop a positive working relationship with that person.** | Sometimes you don't always get the results you want from a person. But try to befriend that person. Put differences aside b/c you have common goals. Try doing things the other person's way. Seek to be a team working together. Working in paint department the employee may not want to help Randy will take the lead role and lead by example to show them that they can do it to[o]. Several times that has helped turn an employee around.<br>The impact on him is the motivation to talk it out and find out what the differences are and talk out about how they might be able to get along better | When he became a supervisor at Buffalo Rock he worked w/Dewayne who did not get the promotion. You can tell when someone is upset. And Dewayne stopped speaking to him. Dewayne would give him attitude whenever he gave instructions. Nate went to his boss about the problem and boss wanted him to try to handle it himself first and suggested finding a common ground. Nate made Dwayne a lead tech and gave him more responsibility. Dewayne accepted the new role but was training the team on his own way of doing things rather than company approved way. Nate pulled Dewayne into office to talk about the problem. He explained the positive aspect of Dewayne but also noted what he was doing wrong. Explained his impression was Dewayne had resentment against Nate. Told him he wasn't threatening but if his behavior didn't change there could be documentation. After that conversation their relationship was better. |
| **8. Describe a time when you set a goal that had an important impact on the store's or company's bottom line.** | Working in Seasonal Living. He took the lead. Joe would walk by (the mgr.) and see Randy's progress is good. Start w/big boxes first for biggest impact. Be safety conscious. Pack out shelf to drive sales. His objective is to get the freight 100% worked with his best effort. Have pride in his work. The goal behind this is to reduce IRG. Getting it done right means less work later. Generates sales for the store and take care of the customer. | At Buffalo Rock he was a supervisor. They refurbished different equipment. One time their dept got an order for 50 vending machines and 20 coolers, in addition to regular work. Tried to figure out how to handle the extra workload. Offered OT to employees for the next 3 weeks, plus picking up extra shifts. Most accepted. Then did same w/paint shop. Also needed 2 from Rec'g dept. Got a total of 9 guys to pick up OT. Worked an extra order from 3pm – 6pm every night. W/in 3 weeks they got the extra work done plus their regular workload. This success encouraged |

| | | repeat business to the company from the same customer. Also made Saturday a casual dress day and also radio for music. But still be safe. |
| --- | --- | --- |

(Declaration of Tim Shelley, doc. 28-10 ("Shelley Decl.") at ¶ 4; doc. 28-8 at 2-26).[5]  Shelley gave

Mitchell a score of 47 (average score of 5.88) and Albright a score of 31 (average score of 3.88).

(Doc. 28-8 at 12, 26).   However, Albright's score was a miscalculation based on Shelley's

erroneous addition of the scores; it should have been 35 (average score of 4.4).  (Shelley Depo. at

33 (120:4-11); Shelley Decl. at ¶ 5).

Albright testified he had no problem with Shelley, and that Shelley never made any

discriminatory remarks to him.  (Albright Depo. at 21 (74:9-20), 29-30 (108:13-17, 110:17-20)).

### C. Hiring Decision

Albright testified he thought Sloan made the hiring decision because of the reference to

Albright's age.  (Albright Depo. at 21 (74:23-75:6), 30 (112:13-113:4)).   However, Shelley was

the hiring manager and ultimately made the decision to select Mitchell over Albright.[6]  (Shelley

Depo. at 24 (82:2-85:5), 34 (124:17-125:6); Sloan Depo. at 24 (85:10-15), 26 (90:21-23), 29

(103:17-104:8), 31 (110:22-111:14)).  Sloan believed that his interview "didn't count," but was

_____

[5] After he was informed not to use Sloan's packet, Shelley transcribed his notes from Sloan's packet onto a clean interview packet.  (Shelley Depo. at 32-33 (117:22-118:9)).  This packet is an exhibit to Shelley's deposition.

[6] Mitchell testified whomever was ultimately hired would report to Shelley, so he believed Sloan had conducted the second interview to make an objective choice.  (Mitchell Depo. at 34 (123:13-124:11)).  To the extent Albright relies on this to support the inference Sloan was the decisionmaker, (*see* doc. 29 at 12), Mitchell is factually wrong about the order of the interviews as both parties accept it.  In light of that, the inference Albright suggests would follow from Mitchell's testimony is not a reasonable one.

16

not told this by anyone at Lowe's.  (Sloan Depo. at 31-32 (113:14-114:1)).  Jones testified that the managers who interview the candidates make the hiring decisions, and in his opinion Sloan's interview also counted.  (Jones Depo. at 8 (20:5-10), 35 (128:17-129:6)).

Shelley determined Mitchell's interview answers were better: they "exhibited greater initiative and understanding of the Night Stocking Manager position's responsibilities during his interview than Albright's did" and "convey[ed] more clearly how Mitchell would handle the job and perform in a given situation."  (Shelley Decl. at ¶¶ 6-7; Shelley Depo. at 25-26 (86:2-4, 87:22-88:11, 91:23-92:1)).  Shelley agreed good interview skills did not necessarily make a person a better candidate for the actual job.  (Shelley Depo. at 26 (92:2-6)).  Shelley told Mitchell he got the job because he did well on the interview.  (Mitchell Depo. 14 (44:20-45:18)).  Jones testified neither Sloan nor Shelley told him why the promotion decision was made other than that Mitchell was selected because he had had a better interview that was "more consistent with the skills and what we were looking for."  (Jones Depo. at 39 (144:9-145:8)).

Although Shelley was the hiring manager, Sloan informed Albright he had not gotten the job.[7]  Albright believed he had not gotten the job because of his age and told Sloan as much.  (Albright Depo. at 32 (122:12-15)).  Sloan did not make any comments in response to this and "just played it off."  (*Id.* at 32-33 (120:14-123:15)).  Albright testified he did not feel that anyone other than Sloan discriminated against him.  (*Id.* at 33 (125:2-6)).

Subsequently, Mitchell did not perform well at the Night Stocking Manager job, often

---

[7] Shelley did not recall whether he notified Albright that he had not gotten the position, but testified it was probable Sloan had actually conveyed the news.  (Shelley Depo. at 34-35 (125:12-127:13)).

relying on Albright for information on his duties.  (Shelley Depo. at 17-18 (56:17-58:16); Albright

Depo. at 33-34 (125:23-128:3); Albright Decl. at ¶¶ 11-13).  Mitchell was ultimately terminated

after accruing a number of reprimands, including reprimands related to critical duties of the Night

Stocking Manager position.  (Seifried Depo. at 17 (54:6-55:23)).

## III. Analysis

Under the ADEA, it is unlawful for employers to discriminate against employees who are

over forty years old "because of" their age.  *See* 29 U.S.C. §§ 623(a)(1), 631(a).  The Supreme

Court has explained that this standard requires an ADEA plaintiff to show "but-for" causation.

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  "[A] but-for test directs us to change

one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.

*Bostock v. Clayton Cty., Georgia*, --- U.S. ----, 140 S. Ct. 1731, 1739 (2020).

When a plaintiff bases his ADEA claim on circumstantial evidence, the court generally

applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 800 (1973).  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) ("following *Gross,* we

have continued to evaluate ADEA claims based on circumstantial evidence under the *McDonnell*

*Douglas* framework").  Under the *McDonnell Douglas* framework, "the plaintiff bears the initial

burden of establishing a *prima facie* case of discrimination by showing (1) that [he] belongs to a

protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was

qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated'

employees outside [his] class more favorably."  *Lewis v. City of Union City, Georgia*, 918 F.3d

1213, 1220–21 (11th Cir. 2019) (citation omitted).  If the plaintiff makes this showing by a

preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate,

18

nondiscriminatory reason for its actions.  *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant makes this showing, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256).

Here, Lowe's does not challenge Albright's *prima facie* case.[8]  (*See* doc. 26 at 17-18). Instead, Lowe's bases its motion on the absence of evidence of pretext.  (*See id.*).  In response, Albright casts doubt on Lowe's legitimate, nondiscriminatory reason for its failure to promote him, (doc. 29 at 17-24), then argues he can show pretext, (*id.* at 24-29).  Albright also contends he has shown a "convincing mosaic of circumstantial evidence" to support an inference of intentional discrimination, even without relying on the *McDonnell Douglas* framework.  (*Id.* at 29-31).

### A. Legitimate Nondiscriminatory Reason

A defendant bears an "exceedingly light" burden to show a legitimate, nondiscriminatory reason for its decision.  *Perryman v. Johnson Prods., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983). "The employer need only offer admissible evidence sufficient to raise a genuine issue of fact as to

---

[8] In the specific case of a failure-to-promote case alleging age discrimination, the plaintiff can establish a *prima facie* case by showing: "(1) that he was a member of the protected group of persons between the ages of forty and seventy; (2) that he was subject to adverse employment action; (3) that a substantially younger person filled the position that he sought or from which he was discharged; and (4) that he was qualified to do the job for which he was rejected." *Rodriguez v. Secretary, U.S. Dept. of Homeland Sec.,* 608 Fed. Appx. 717, 719-20 (11th Cir. 2015).  The summary judgment evidence supports each of these elements.

whether it had a legitimate reason for not [promoting] the plaintiff." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994).  A defendant's explanation must be "clear and reasonably specific."  *Conner v. Fort Gordon Bus Co.*, 761 F. 2d 1495 (11th Cir. 1985) (citing *Burdine*, 450 U.S. at 258).

Lowe's nondiscriminatory reason is simple: Mitchell was promoted because he scored higher on the interview than Albright, not because he was younger.  (Doc. 26 at 17).  Shelley administered interview questions to both candidates and scored Mitchell higher than Albright on the interview matrices.  He based this score on his belief that Mitchell's answers "exhibited greater initiative and understanding of the Night Stocking Manager position's responsibilities during his interview than Albright's did" and "convey[ed] more clearly how Mitchell would handle the job and perform in a given situation."  The interview instructions provided by Lowe's direct that the candidate with the higher score is generally to be selected, which is what Shelley ultimately did. Albright responds that Lowe's has failed to meet its burden because Sloan was also a decisionmaker for whom Lowe's has failed to articulate a legitimate nondiscriminatory reason, and because its basis for promoting Mitchell over him was entirely subjective.  (Doc. 29 at 17).

Albrights' first argument hinges on his contention there is a factual dispute as to whether Sloan was a decisionmaker who "played a role at least equal to, if not greater than, Shelley's role in determining the promotion selection," (doc. 29 at 18-19), and that Lowe's failed to mention Sloan's involvement at all in the argument section of its brief, (*id.* at 19-20).  This misses the mark. First, while Albright points to Shelley's testimony that his understanding was that Jones and Sloan were involved in the decision as to which candidates to select for interviews, this is not relevant to who made the overall decision to hire Mitchell; at most, it shows that Sloan had some role in the

hiring process, which is not in dispute.[9]  Second, regardless of whether Sloan's scores "counted"

in or influenced the decision-making process, the undisputed evidence is that Sloan left the final

decision up to Shelley.  It is reasonable to consider Sloan's alleged ageist bias and influence over

Shelley at the pretext stage because he was, potentially, "an integral part of the [hiring] process,"

*see Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999), but this does not impact whether

Lowe's proffered nondiscriminatory reason is legitimate such that it can meet its light burden at

this stage.

As for the subjectivity of the interview process, it is accurate that the scoring method is

based on a subjective evaluation of the interviewee's answers.[10]  Albright initially relies on *Harris*

*v. Birmingham Bd. of Educ.*, 712 F.2d 1377 (11th Cir. 1983) for the proposition that "[t]he failure

to establish fixed or reasonably objective standards or procedures for hiring is a discriminatory

practice.  (Doc. 29 at 23) (citing *Harris*, 712 F.2d at 1083).  However, the en banc Eleventh Circuit

expressly held in a case postdating *Harris* that "[s]ubjective reasons can be just as valid as

objective reasons," and that in case of "any inconsistency between our past decisions and our

decision today . . . the rule we announce today controls."  *Chapman v. AI Transp.*, 229 F.3d 1012,

1034-35 (11th Cir. 2000).  *Chapman* requires an employer asserting a subjective reason for an

employment decision to "articulate[] a clear and reasonably specific factual basis upon which it

---

[9] Furthermore, it is unclear how it would bolster Albright's case that Sloan held an age-related animus against him to show that Sloan participated in selecting him for an interview.

[10] Albright argues the scoring criteria could have been manipulated by bias to provide a leg up to a preferred candidate, (doc. 20 at 23), but this is an argument about the falsity of his score and not whether subjectivity dooms Lowe's purportedly nondiscriminatory reason for promoting Mitchell.  Consequently, it is discussed below in the pretext context.

based its subjective opinion." *Id.* The Eleventh Circuit distinguished a situation in which an employer asserted it failed to hire a candidate because "I did not like his appearance"—a legally insufficient justification—from a situation in which it stated "'I did not like his appearance because his hair was uncombed and he had dandruff all over his shoulders,' or 'because he had his nose pierced,' or 'because his fingernails were dirty,' or 'because he came to the interview wearing short pants and a T-shirt'"—each of which would qualify as a legitimate, nondiscriminatory reason because it provides the specific reasoning underlying the subjective opinion. *Id.* What matters is that the factors the employer cites are "capable of objective evaluation." *Id.* at 1035 (quoting *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1280 n.17 (11th Cir. 2000)).

To demonstrate the factors Shelley cited are not adequate, Albright points to *Casey v. Clayton Cty., Ga.*, 2006 WL 870379 (N.D. Ga. Mar. 30, 2006), a case in which a court found an employer's proffered reason insufficient. (Doc. 29 at 19-20). In that case, the employer was asked repeatedly to provide a more specific basis for a hiring decision, but could say only that the hired candidate "appeared more knowledgeable" and that "her presentation was better." *Casey*, 2006 WL 870379 at *10. Here, though, Shelley provided more than simply stating that Mitchell interviewed better. Shelley provided the basis for his subjective opinion: an interviewee's answers provided insight into how the interviewee would perform in the job, and Mitchell's answers were more consistent with the job he was being asked to do and exhibited greater initiative and understanding of the position. This is more like the reason the Eleventh Circuit found sufficient in *Chapman*, in which one interviewer stated the plaintiff "was not very concise with his answers" and "did not take an aggressive approach in asking me questions about the position," and the other interviewer indicated he "had more confidence in [the hired candidate] in the way he presented his

work history."  229 F.3d at 1035.  As the *Chapman* court observed, "[t]raits such as 'common sense, good judgment, originality, ambition, loyalty, and tact' often must be assessed primarily in a subjective fashion . . . yet they are essential to an individual's success in a supervisory or professional position."  229 F.3d at 1034 (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 991 (1988)).  There is no requirement that Lowe's make a detailed connection between specific job skills and Albright's purportedly inadequate answers, any more than the interviewer in *Chapman* was required to elaborate on his confidence in the way the hired candidate presented his work history.[11]  Furthermore, the reasons Shelley cited are capable of objective evaluation because evidence regarding the position's qualifications and Shelley's notes of the interview are part of the summary judgment record.  Lowe's has met its burden to show a legitimate, nondiscriminatory reason for not promoting Albright, and the burden shifts back to him to show pretext.

### B. Pretext

"The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate

_____

[11] Albright points out one interviewer in *Chapman*, Wogsland, did make a more explicit connection between the plaintiff's non-concise answers and the job requirements: the concision required to communicate with technicians.  (Doc. 29 at 22).  However, the Eleventh Circuit explicitly found that the other interviewer, Turnquist, who made no such connection, <u>also</u> provided a reasonably clear and specific explanation for his subjective assessment the plaintiff had given a worse interview.  *Chapman*, 229 F.3d at 1035.  Shelley's explanation here is considerably more detailed than Turnquist's was in *Chapman*.

reasons were not what actually motivated its conduct.'" *Crawford v. Carroll,* 529 F.3d 961, 976 (11th Cir. 2008).  A pretextual reason is not only one that is false but one that conceals an actual, discriminatory reason. *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).  A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

Albright offers three arguments to support pretext: Sloan's biased comments, Lowe's deviations from its usual hiring practices, and the disparity in qualifications between the two candidates.  None of these suffice.[12]

### 1. Biased Comments

Albright's pretext argument starts by pointing to Sloan's allegedly biased comments about his age.  (Doc. 29 at 24-26).  This does not directly establish pretext because Shelley, and not Sloan, was the decisionmaker (although Shelley's role as a potential "cat's paw" for Sloan in the hiring process is discussed further below).  And it does not suffice for Sloan in any case because the comments, even viewed in the light most favorable to Albright, do not reflect animus.

There are two instances in the record of Sloan's age-related comments: Sloan pointing

---

[12] Although Albright contends it is difficult for him to prove the falsity of Lowe's reasons for selecting Mitchell over him, (*see, e.g.*, doc. 29 at 21 n.14), the undersigned emphasizes that the main problem with his pretext arguments, as discussed below, is that Albright cannot show the second part of the pretext inquiry: that the real reason was age-based discrimination.  *See Brooks*, 446 F.3d at 1163 (a reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphasis in original).

Albright out as the oldest or longest-tenured employee, and Sloan commenting "you and I don't usually get interviews" prior to interviewing Albright.  Taking the evidence favorably to Albright, both of these comments are about Albright's age.  That said, it is unclear how either shows discriminatory animus.  Albright contends these demonstrate Sloan "believed younger employees were more deserving of interviews and promotions," (doc. 29 at 25), but that does not square with Albright's simultaneous contention Sloan helped select Albright for an interview.  As Lowe's observes, (doc. 30 at 10-11), a reasonable jury could not believe Sloan, who is close in age to Albright, set aside his age-related bias in helping Albright get the type of interview the two older men "don't usually get," then scored Albright lower at the interview stage due to age-related bias.  And recognizing Albright as the oldest employee at a storewide function is neutral at worst, complimentary at best.  *See Johnson v. Gestamp Alabama, LLC*, 946 F. Supp. 2d 1180, 1204 (N.D. Ala. 2013) (compliments such as "you look great for your age" showed awareness of plaintiff's age, but did not support discriminatory motive for termination).  Sloan's failure to explicitly deny Albright's allegation that Albright was not promoted because of his age and "just play[ing] it off" is potentially more on point, although Sloan's apparent silence is not itself a biased comment.  However, it is unreasonable to stretch Albright's vague testimony regarding Sloan's response to a tacit admission of discrimination, particularly when Shelley—a concededly unbiased actor— scored Albright and Mitchell similarly to how Sloan scored them.  None of Sloan's comments are sufficient to show pretext, nor is his response to Albright's accusation of age-related bias.

## 2. Deviations from Policy

Albright's second argument is that Lowe's deviated from its usual policies in the interview process.  (Doc. 29 at 26-28).  "Standing alone, deviation from a company policy does not

demonstrate discriminatory animus." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir. 1999). Rather, "[t]o establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner." *Rojas v. Fla.*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002).

The most serious deviation, in Albright's telling, is Shelley's use of Sloan's interview packet.  The undisputed evidence is that Shelley had Mitchell's packet, but not Albright's. Albright argues because "Shelley does not remember whether he obtained both candidates' packets, and because Sloan interviewed both candidates on the same day and turned both packets back in to Jones, a reasonable jury could infer that Shelley had both packets."  (Doc. 29 at 26). But Shelley did not testify that he did not remember whether he picked up Albrights packet; he testified he did not recall doing so, and that in any case he had not used Albright's packet in Albright's interview.  (Shelley Depo. at 30-31 (109:21-110:20)).  Shelley also testified he did not pay attention to Sloan's notes.  (*Id.* at 33 (118:14-20)).  Albright casts this last piece of testimony as not credible, (doc. 29 at 26), but the court does not make such determinations at summary judgment.  Albright points to no evidence to contradict Shelley's testimony such that the undersigned could draw an inference in Albright's favor on the basis of anything other than speculation.  Nor is it implausible that Shelley did not rely on Sloan's notes in his interview. Shelley's notes are quite different from Sloan's, and, although the interview questions were identical, Mitchell provided some different responses at each interview.  For example, asked to tell the interviewer about "a time when you took a complex situation or issue and provided a simple and actionable solution," Mitchell described an experience unloading trucks at a Lowe's store to Sloan, (*see* doc. 28-5 at 29), but provided an example of a Buffalo Rock tool project to Shelley, (*see* doc. 28-8 at 6).

In any case, as Lowe's points out, Albright's argument attempts to graft Sloan's allegedly discriminatory motive onto Shelley, who made the actual hiring decision.  This is a cat's paw argument, although Albright does not use that specific term.   A "cat's paw" theory of recovery applies where a plaintiff shows that the decisionmaker followed a biased recommendation without independently investigating that recommendation. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus. *Id.* at 1132. Under this theory, if the decision-making party followed the biased recommendation without independent investigation—essentially acting as a rubber stamp—then the recommender's discriminatory animus is imputed to the decisionmaker. *Id.* at 1331–32. If, however, a decisionmaker conducts his own evaluation and makes an independent decision, the decision is free of the taint of a biased subordinate employee. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270–71 (11th Cir. 2001). *See also Crawford,* 529 F.3d at 979.  Here, notwithstanding Sloan's role in the hiring process (e.g., selecting candidates for interviews and conducting the first round of interviews), the undisputed evidence is that Shelley did not discuss scores with Sloan or talk to him before the interview, conducted his own interviews, provided his own scores and notes for both candidates (regardless of whether he saw Sloan's scores or notes for Mitchell), and based his ultimate decision on the results of the two candidates' interviews with him.  Whatever Sloan's motive, Shelley made a separate inquiry and exercised separate judgment, so Albright's cat's paw theory fails.

Albright also argues the interviewers' failure to ask Mitchell and Albright about their work experience was a deviation from policy that diminished the importance of his relevant work

experience and left the interviewers solely reliant on their subjective evaluations of the candidates' answers to the eight interview questions. (Doc. 29 at 27). First, Albright does not demonstrate how this was discriminatory, i.e., that it had anything to do with his age. Second, to the extent this was a deviation from Lowe's policies, it is a deviation that had nothing to do with how the interviews are scored. Even if Shelley and Sloan had asked the candidates about their work experience, the interview guidelines do not require the interviewer to assign any score to the preliminary "stage-setting" questions or to take those into account in scoring the eight interview questions; by its own terms, the question requesting the candidates explain their work experience is not part of the formal interview. Albright does not indicate how he would have scored higher, or how the subjectivity of the interview questions would have been mitigated, had Sloan and Shelley followed the guidelines more specifically. Finally, the eight interview questions ask candidates for specific examples of past projects and work experiences, so Albright and Mitchell were both free to bring up their work histories in response—as Shelley testified, (*see* Shelley Depo. at 25 (87:5-15)).[13]

Finally, Albright points to "the selection of only two, as opposed to the required three, candidates for interviews and Lowe's failure to check the accuracy of Mitchell's

---

[13] To the extent Albright argues Sloan and Shelley sabotaged the interview process by failing to ask him follow-up questions that might have helped him while asking Mitchell follow-up questions, it is unclear that follow-up questions are uniformly helpful to a candidate. An interviewer might follow up when a candidate provides a dubious answer, or the candidate may stumble when asked to provide more granular detail. Additionally, Albright points to no evidence indicating Shelley had a discriminatory motive at all, including in failing to ask follow-ups; in fact, Albright testified he had no problems with Shelley, (Albright Depo. at 21 (74:19-22)), and that he felt no one other than Sloan discriminated against him, (*id.* at 33 (126:2-6)).

resume/application." (Doc. 29 at 28). Selecting two candidates was consistent with Lowe's policy at the time of the interviews. And even if Lowe's HR failed to adequately vet Mitchell when reviewing his application or resume, it is unclear how this demonstrates the interview process, which relied on different criteria, was pretextual. Most importantly, neither of these have anything to do with the candidates' ages.

### 3. Candidate Qualifications

Albright's final example of pretext is the disparity in the candidates' qualifications. "[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). "In the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even showing that he was better qualified than the person who received the position he coveted." *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (cleaned up). "A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [age]." *Id.* And a plaintiff must show "the disparities between the successful applicant's and his own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* (citation omitted).

Here, Albright points to his greater experience in all relevant categories. However, these were not the only qualifications for the position. Lowe's policy specifically centers around candidate interviews. Albright disputes the wisdom of this policy, but that does not and cannot demonstrate pretext. *See Chapman*, 229 F.3d at 1030 ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.");

*Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000) (holding, in Title VII race discrimination case, "it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."). What Albright does not dispute, and what the record supports, is that Mitchell was also qualified for the Night Stocking Manager position. The undersigned cannot say that the disparity between Albright and Mitchell is such that no reasonable employer would have chosen Mitchell over Albright when the interview process is taken into account.[14]

Because Albright has failed to show Lowe's reasons for promoting Mitchell over him were pretextual, he cannot pass through the *McDonnell Douglas* framework.

### C. Convincing Mosaic

Finally, Albright argues he may survive summary judgment because the record contains "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." (Doc. 29 at 29-30) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff may show a "convincing mosaic" through evidence that falls into any of a number of broad categories, such as "(1) suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citation and internal quotation marks omitted). "The critical decision

---

[14] Albright notes, here and elsewhere, that Mitchell failed to adequately perform the Night Stocking Manager role. (Doc. 29 at 28, 29 n.19). This is not material to the actual decision to promote Mitchell.

that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Smith*, 644 F.3d at 1328).

Albright's convincing mosaic argument is essentially a rehash of all the arguments above, stripped out of the *McDonnell Douglas* framework.  The thrust of this is that Sloan's bias infected the promotion process, and influenced Shelley's decision.  For the same reasons Albright has failed to show Sloan's comments regarding age support pretext, he has also failed to demonstrate that the comments are part of a convincing mosaic of evidence supporting discriminatory intent. Furthermore, because Shelley was the decisionmaker, and Albright has failed to show Shelley was Sloan's cat's paw, Albright could not impute Sloan's motive to Shelley in any case.  Accordingly, Lowe's is entitled to summary judgment.

### IV. Conclusion

For the reasons stated above, Lowe's motion for summary judgment is **GRANTED**.  A separate order will be entered.

DONE this 29th day of March, 2021.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE